People of the State of Illinois, Defendant in Error, v. Frank Parker and George Moran, Plaintiffs in Error.

Gen. No. 41,099.

.308

Opinion filed May 13, 1941.  Rehearing denied June 2, 1941.

Wм. Scoтт Sтεwаrт, of Chicago, for plaintiffs in error.

Тномаѕ J. Courtney, State's Attorney, for defendant in error; Robert E. Wright and John T. Gallagher, Assistant State's Attorneys, of counsel.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This writ of error is brought by Frank Parker and George Moran to review a judgment and sentence rendered against each of them on verdicts of a jury which found them guilty of conspiracy as charged in the indictment. They with eight other defendants were charged by two counts of the indictment with conspiracy to forge and counterfeit travelers' checks purporting to be made and issued by the American Express Company, with intent to damage and defraud any and all persons who could be induced to accept said checks and pay the alleged conspirators money or property therefor; and by two other counts with unlawfully conspiring to falsely utter, publish and pass as true and genuine said forged and counterfeited checks with like intent.

Two of the defendants, Carl Silver and Frank Quigley, were not apprehended. Three others, Berger Hanson, Del F. Bruno and Emil Ahrens, who testified for the State, pleaded guilty and were each sentenced to the county jail for one day, the sentences to be considered served on recommendation of the State's Attorney. The jury returned a verdict of not guilty as to defendants Frank Hicketts, alias Frank Ross, Daniel Keller and Robert Sexton. As already stated there were verdicts of guilty as to defendants Parker and Moran and they were each sentenced to serve one year in the county jail and to pay a fine of $2,000. This writ of error was originally sued out of the Supreme Court, which transferred it to this court.

The record contains more than eleven hundred pages of testimony, but we think the following outline of the essential facts and cicumstances in evidence will afford a proper understanding of the questions presented.

Defendant George Moran testified on cross-examination that he had known Carl Silver about fifteen or sixteen years; that he and Silver had both been in the "bootlegging business" and transacted

business with one another; that he saw Silver frequently until the ''end of prohibition'' and had quite a few business dealings with him during that time; and that ''after prohibition'' he saw Silver on several occasions and had some business transactions with him. Moran further testified that he met the defendant Frank Parker in Chicago during ''prohibition days'' and had some transactions with him in the ''bootlegging business''; and that he continued to have business transactions with Parker until April 21, 1938, when he and Parker were arrested.

Berger Hanson engraved the plates and printed the counterfeit American Express Company travelers' checks. Defendant Carl Silver met Hanson about January 3, 1938, and, after showing him an American Express Company travelers' check, asked him if he could counterfeit same. In response to a telephone call Hanson met Silver about a week later and informed the latter that he could counterfeit the checks and that it would cost. $500 or $600 and take three or four weeks to do the work. Silver said that he would talk to his people about it. Silver picked Hanson up at his place of business in the Rand McNally Building at Clark and Harrison streets on February 11, 1938, and drove to an office of the American Express Company on Randolph street between Wabash and Michigan avenues. Silver left Hanson in his car and went into the office of the American Express Company, where he purchased five travelers' checks, one of the denomination of $100, one of $50, two of $20 and one of $10. Silver returned to his automobile and gave all the checks to Hanson except one of the $20 checks, explaining that they were the copies for reproduction. On that occasion, after Silver gave Hanson $100 in cash, he told him he would give him more later and that they could get rid of $100,000 worth of the checks in Chicago and $50,000 worth in Kansas City. Hanson started to work on the plates for the checks on Febru-

ary 13, 1938, and finished making them about March 20, 1938. He had printed checks of the face value of $20,000 from these plates on March 24, 1938. In engraving the plates and printing the counterfeit checks, Hanson was assisted by defendants Emil Ahrens and Del F. Bruno. March 26, 1938, Hanson again met Silver and after giving the latter samples of the checks that had been finished he told him that the job was not good enough and that he would have to "make the whole thing over," which would take another two weeks. Later that same day, at Silver's request, Hanson went to Jake's book at Grand avenue and State street, where he met George Moran and Silver and talked with them about the checks. Moran stated that he thought that it was a poor job, that the numbers were not even and made other comments concerning the quality of the work. Hanson told Moran that he was going to make the plates over. Hanson next met Moran at Jake's book about March 30, 1938, and they had a further discussion concerning the checks. Moran requested Hanson to meet him at Jake's book again on April 2, 1938, at which time Moran told him that he had a man who wanted $11,000 worth of the checks and that they had to be perfect. Moran said that he wanted these checks as soon as possible and Hanson told him that he would have them ready in about two weeks. A few days later, about April 5, 1938, Hanson went to Jake's book at Moran's request, taking with him some black proofs that he had made from the new plates. Moran looked at the proofs and suggested some corrections, which Hanson agreed to make. About April 13, 1938, Silver went to Hanson's place of business, obtained two sample checks, one of the denomination of $50 and the other of $100, from each of which Hanson cut off a corner so that Silver could not use them. These samples were printed from the new plates. That afternoon Hanson went to Jake's book, where he met Silver and Moran and the latter

said, "You fellows are putting yourselves in a hot spot . . . the West Side bunch were putting up all the money for the checks and that they had given Silver $1,800." Hanson told them that he did not know anything about the $1,800, but that if Silver had received that much from "some West Side bunch," Silver should give him some more money. Following this discussion Moran told Hanson to print an additional $25,000 worth of checks after he had printed the $11,000 worth of checks, concerning which Moran had talked to him a few days before.

Moran in his testimony admitted the meeting with Hanson and Silver just referred to, but stated that the purpose of this meeting was to assist Silver in collecting some money from Hanson. In this connection Hanson testified that he never owed Silver any money and nobody ever stated or suggested to him at any time or place that he did owe money to Silver.

At the time of the meeting between Silver, Moran and Hanson at Jake's book on April 13, 1938, the defendant Bruno was in Kansas City. When Hanson left George Moran and Silver at Jake's book on that occasion, he stopped at a Postal Telegraph office and sent the following telegram to Bruno in Kansas City: "George wants 36,000. Should we make them. Will be at office tonight. Berger." The original of this telegram in Hanson's handwriting was received in evidence after it had been produced by the Postal Telegraph Company upon the trial of this cause. Bruno received the telegram and called Hanson on the long distance telephone from Kansas City on the evening of April 14, 1938. On April 17, 1938, Hanson met Moran by appointment on Harrison street between Clark and La Salle streets, where Moran was waiting in an automobile. Moran asked Hanson if the checks were ready and when the latter inquired, "How do you expect to get any work done if you do not pay for it," Moran said, "To hell with you guys" and drove

away. About 10 a.m. on April 18, 1938, Hanson again met Moran by appointment at the corner of Grand avenue and State street. When he arrived there Moran said to him, "Berger, you got to go along with us or else we will all be broke." Hanson told Moran that he would have to be paid for the work he had done and Moran agreed to get him some money the next day. Hanson then promised to deliver the checks to Moran that evening. Moran telephoned Hanson at the latter's place of business about 7 o'clock that evening and Hanson agreed to meet him at the same place where he had previously met him on Harrison street. Bruno and Ahrens were at Hanson's place of business when the latter received Moran's telephone call. Hanson, Bruno and Ahrens proceeded to wrap up the checks, putting each denomination in a separate package and then wrapping the three packages in one bundle. The three packages contained checks of the face value of $42,000. Hanson and Bruno left with the checks and delivered them to Moran, who was waiting for them in his automobile on Harrison street between Clark and La Salle streets.

Defendant Bruno testified that he accompanied Hanson when the latter met Moran on April 17, 1938, and on April 18, 1938, and that he saw Hanson hand Moran the bundle containing the counterfeit checks in denominations of $20, $50 and $100 and that they had an aggregate face value of $42,000.

Defendant Ahrens testified that he had been a printer for about thirty years and that he assisted Hanson in printing the checks; that the checks were in denominations of $20, $50 and $100 and that he helped to wrap the checks which Hanson and Bruno took out of the former's shop April 18, 1938.

Emile V. Van Bever was a witness for the State. He had a law office in a suite in the Reaper Block, which he rented from one P. L. Adix, who was the lessee of such suite. Van Bever had met defendant Frank

Parker in November, 1937, and had seen him occasionally when he came into Adix's office to dictate letters to the latter's stenographer. About February 20, 1938, Parker went into Van Bever's office and told him that there was going to be a deal on "some paper." Van Bever asked him what kind of a deal and Parker said that it had to do with American Express Company travelers' checks and told him that when the checks were ready Van Bever might know some people who would be interested in them and that he could make himself a "little money." Parker said that the checks would be ready in the near future and that he would keep in touch with Van Bever. At about that time Frank Ross [Frank Hicketts] had been in the habit of accompanying Parker to Adix's office, where Van Bever saw him a number of times. About the first part of March Ross told Van Bever that Parker had told him that he had spoken to Van Bever about the "paper deal." Ross also told Van Bever that he could get him all of the checks he wanted at 15 per cent.

Van Bever went to Savannah, Georgia, about March 16, 1938, and just before he left he had a talk with Walter Paradowski, a member of the Chicago Police Department assigned to the detective bureau. Upon his return to Chicago Van Bever again talked to Paradowski on the telephone and talked with him personally a day or two later, on March 25, 1938. After these talks with Paradowski Van Bever telephoned Parker on April 1, 1938, and told him that he thought he had somebody "who was interested in some of the paper and that they wanted a sample." Parker arranged to meet Van Bever at Adix's office that afternoon and give him a sample. Adix had moved his office to 520 N. Michigan avenue. When Van Bever arrived and stepped off the elevator on the third floor and approached room 316, where he and Adix were located, he saw Parker talking with George Moran. Van Bever spoke to Parker and went into room 316 and when

Parker entered the room a short time later he asked Van Bever why he had not spoken to George and Van Bever told him that "he did not suppose that George would be interested in having anyone recognize him in public." At that time Parker handed Van Bever an envelope in which he found a counterfeit American Express Company travelers' check with the word "canceled" written in the lower right hand corner thereof. This check was received in evidence.

After receiving the check from Parker, Van Bever immediately delivered it to Paradowski. That evening Van Bever met several representatives of the American Express Company and it was arranged that he would start working on the case for said company. He continued to work actively on the case until after May 5, 1938. During all the time he was engaged in the work concerning which he testified, he talked with representatives of the American Express Company daily and he also talked with Paradowski, the police officer, at least once or twice a week. Under Van Bever's arrangement with the American Express Company officials he was to continue to consort with Parker and make Parker believe that he was sincerely interested in the enterprise so that he might ascertain what persons were engaged in the conspiracy and just what they were doing. The American Express Company in accordance with its agreement with Van Bever paid him $170 a week for his services.

On April 5, 1938, Van Bever met Parker on the sixth floor at 30 N. La Salle street, where Parker occupied desk space in the office of a public stenographer named Miss Springer. Van Bever had lunch with Parker that day in Martin's Cafe at 33 N. La Salle street. Harold Keyes, an inspector for the American Express Company, by previous arrangement with Van Bever, was in the restaurant and observed the meeting. On this occasion Parker told Van Bever that everything was going along all right on the "paper deal" and

after lunch he asked Van Bever to go with him to his office. When they arrived there Parker asked Van Bever to wait a few minutes and "go down the street with him." Parker not being quite ready to leave, Van Bever excused himself and went down on La Salle street, where he met Keyes and had a conversation with him. Then he returned to Parker's office and told the latter that he was anxious to get hold "of some of that paper," that he had a buyer and wanted to know definitely when it would be ready. Parker told him it would be ready in a few days. As they started to walk north on La Salle street Parker said to Van Bever, "I want you to meet a fellow that used to be bodyguard for Jerry Horn here. His name is Frank. Quigley. I want to introduce you to Quigley as being the head of this deal. Everybody is trying to get into this, wants to put this paper on the cuff and I don't want to do that. So you just tell him you are handling it and you are the head of it. In that way they will keep from bothering me, that they want this paper on time." On the way to Ahern's saloon Parker also instructed Van Bever to tell Quigley that the price of the paper was 20 per cent and that it had to be cash. When they arrived at Ahern's saloon, Parker introduced Van Bever to Frank Quigley, saying, "Quigley, I want you to meet Von, Von here is the head of this deal and anything that he does is all right." Quigley and Van Bever seated themselves in a booth and had a conversation about the checks. Quigley stated to Van Bever that he could not get any definite idea about when the paper would be ready and that he did not know just what to think about it. He said he and the other "pushers" wanted to get started. Van Bever told him that he thought everything would be ready in a few days now and that "the price would be 20 per cent and it had to be cash." Quigley then told Van Bever that he had some cards printed, "using the

name of J. A. Carpenter, a traveling auditor for the Standard Oil Company." Van Bever said that he would like to see the cards because he might want to show them to some of the other boys who were in on the deal. Quigley went to the back bar, took out a package and went to the basement, followed by Van Bever. He extracted some cards from the package and Van Bever picked up four or five of them and put them in his pocket. One of these cards was received in evidence. After they returned to the bar room Quigley and Van Bever had some further conversation about the deal. Parker made an appointment to pick Van Bever up at the Medinah Club at 6:15 that evening and left the saloon.

Harold Keyes, the agent of the American Express Company, followed Parker and Van Bever to Ahern's saloon on the afternoon of April 5. He went to the rear of the bar, sat on a bench there and ordered a drink. He saw Quigley take a package from the back bar, go to the basement with Van Bever and return. He heard Parker introduce Van Bever to Quigley and tell Quigley, "You can talk to Van, Quigley." Keyes testified that he joined Van Bever at the Pure Oil Building after they left the saloon and that Van Bever gave him one of the A. J. Carpenter cards that Quigley had produced.

That evening Parker picked Van Bever up at the Medinah Club and took him out to his apartment for dinner. While they were there Parker called a number on the telephone and said, "Is Mr. Hanley there? Is George there?" and then hung up. Moran testified at the trial that when he was arrested he was living at 240 E. Delaware place with his wife under the name of Mr. and Mrs. George Hanley.

On April 7, 1938, Van Bever called Parker on the telephone from the office of the American Express Company. Joseph T. Walsh, financial manager of the Express Company, listened in on another telephone

and heard the conversation. In that conversation Van Bever told Parker that he had a letter from New York and read it to Parker over the telephone. He told him that he had a man who wanted $1,000 of the paper and wanted to get it at 15 per cent. Parker said that he would absolutely arrange it so that Van Bever could get it. Parker then told Van Bever to meet him at Trafton's Gymnasium at 2 o'clock. Mr. Walsh testified that he took this entire conversation down in shorthand and that it was as Van Bever related it.

On April 8, 1938, Parker told Van Bever to go and see Quigley again at Ahern's saloon, which he did. On that occasion Quigley told Van Bever that he wanted him to meet some men who were coming in from Canada the following Sunday. He asked Van Bever who was going to take care of the backs for the checks and Van Bever told him he would let him know. After leaving the saloon Van Bever went to Parker's office and discussed Quigley's conversation with him. Parker told him it would be all right to meet the people from Canada on Sunday and also told him that everybody had to buy their own backs for the checks.

On April 9, 1938, Van Bever saw Quigley in Ahern's saloon and Quigley showed him a billfold containing an identification card and a small photograph of himself. Quigley said that he had to have his name and address typed in and Van Bever suggested that he would take the card, have it done for him and return it. Quigley told him the address he wanted to put on it. Van Bever took the card to the office of the American Express Company and gave it to Mr. Keyes and after the name and address had been typed on it, he returned it to Quigley. The card and small photograph were received in evidence. The card had typed on its face: "A. J. Carpenter, 3500 Sheridan Road, Chicago, Illinois." Keyes testified that Van Bever brought the card to him on the evening of April 9, and, after talking with Van Bever about it, he typed the

name, "A. J. Carpenter, 3500 Sheridan Road, Chicago, Illinois," and gave it back to Van Bever. When Quigley was arrested in Pittsburgh on April 21, 1938, the billfold containing the identification card and small photograph just referred to were in his possession. In Pittsburgh he used the name, "A. J. Carpenter" in signing the counterfeit checks which he passed there.

It should be noted at this point that it was on April 13, 1938, that Hanson turned over to Silver two sample checks with the corners cut off, one of the denomination of $50 and the other of $100. The following morning Ross, alias Hicketts, who had been frequenting Adix's office with Parker and had previously talked with Van Bever about the "paper deal," went to Van Bever's room in the Medinah Club and handed him two counterfeit American Express Company travelers' checks, one of the denomination of $50 and the other of the denomination of $100, the lower left hand corner of each of which had been clipped off. Ross asked, "How do you like these?" Van Bever said, "Frank, now that begins to look like something, let me take them, I want to take them to whoever wants to buy them or bid on some of that paper." Ross said that it would be all right for Van Bever to take them but he had to have them back at 12 o'clock. Van Bever took the checks to the office of the American Express Company and showed them to Joseph T. Walsh, the financial manager, Harold C. Keyes, Harry C. Eldridge, a special agent, Charles C. Troyana, a special agent, and Charles J. White, the general manager, all of whom testified that they saw those checks on that day.

On the afternoon of April 13, 1938, Mr. Walsh of the American Express Company, gave Van Bever $150 in cash to buy $1,000 worth of the counterfeit checks at 15 per cent and the same afternoon Troyana met Van Bever in the lobby of the Medinah Club and had a talk with him. He then sat on a chair facing a settee

in the front lobby. A short time thereafter Ross came in and Van Bever sat down with him on the settee near Troyana. Van Bever paid Ross some money for some work which Van Bever had arranged for Ross to do so that Van Bever could keep in close contact with him. This work consisted of looking up some records in the offices of the clerks of the superior and circuit courts. Troyana testified that, while they sat in the lobby of the Medinah Club, Van Bever asked Ross, "By the way, is that stuff ready?" Ross said, "Come with me now up to George's house." Van Bever said, "No, I don't want to go there." Ross said, "It is only three blocks from here." Van Bever said, "I don't want to go, you go there." Ross said, "What the hell are you afraid of? I am with you." Van Bever said, "No, I don't want to go, you 'phone him." Ross went to the telephone and reported that the line was busy. While he was gone Troyana talked with Van Bever and left the Medinah Club. He waited outside and fifteen minutes later saw Ross leave. After Troyana left Van Bever and Ross went back to the telephone booth and Ross dialed a number. Van Bever heard Ross say, "Is George there?" After a few moments, Ross motioned him to come nearer to the receiver so he could hear. Ross said, "George, I wish you would do that for me, I am trying to help a friend and make a little money for myself." The other party to the telephone conversation said, "Well Frank, you know I can't do that, I got stuck last year on that deal and it cost me five grand, I can't do anything under $5,000 worth." Ross said, "Well, all right, George" and hung up.

On April 15, 1938, Van Bever met Parker about noon. Parker asked Van Bever to go and see Quigley with him. On the way to Ahern's saloon, Parker said to Van Bever, "I have O.K.'d Quigley with the Dagos for $10,000 worth of the paper." Van Bever then asked where he came in and Parker told him that he

would get $11,000 worth of the paper and give Quigley $10,000 and the other $1,000 would be for Van Bever. When they got to Ahern's saloon Van Bever told Quigley that Parker said he could get $10,000 worth of the paper and the "stuff" would be ready in a few days. Quigley asked him to drop in the next day and he would have some boys there he wanted him to meet. He said that he and four men were going to take Pittsburgh and Philadelphia and that they wanted to get started. This was a day or two after Moran had told Hanson, "After you get through with this $11,000 worth of checks, why you print up $25,000 more and make them all in one delivery."

On April 16, 1938, at about 2:30 or 3 p. m. Van Bever went to Ahern's saloon and saw Quigley at the bar with two men. Quigley told him, "You are just the man I want to see, tell these boys when this stuff is going to be ready. I want you to meet Mr. Sexton and Mr. Driscoll." Van Bever said, "Well, boys, I think everything will be ready in a few days." Parker came in about that time and Van Bever said, "Come here, Frank, tell these men when that paper will be ready." Quigley then introduced Parker to Sexton and Driscoll and Van Bever walked to the front of the saloon. Parker came up to where he was and said, "What are you trying to do, put me in the middle, I do not want to meet any of these people." Van Bever replied that "he thought Parker should tell them when the stuff was going to be ready." That evening Parker called Van Bever on the telephone and said to him, "Van, you are absolutely right about the ink on those checks, or the color of them, the boys are going to work all night tonight and all day Sunday to get them out, so stand by and I will let you know," to which Van Bever replied, "All right." As heretofore stated this conversation took place on April 16, 1938, and it will be recalled that Hanson testified that Moran tried to get him to deliver the checks on Sunday evening, April

17, 1938, and that they were actually delivered to Moran, according to Hanson and Bruno, on Monday evening April 18, 1938.

Mrs. Bernice Quigley, the wife of Frank Quigley, testified that on the morning of April 19, 1938, she was in the bathroom dressing after having taken a bath; that she was fully clad in a house dress when she heard her husband call about 8:30 or 9:00 a. m.; that she went to the door and noticed that the coat of his pajamas had caught in the door and that the door was closed and locked; that she opened the door and when she did so she saw Frank Parker jump aside; and that when he observed her he said, "Good morning, Mrs. Quigley." At the time she testified her husband, Frank Quigley, was in the Allegheny County Workhouse in Pennsylvania.

When Troyana, one of the special agents for the American Express Company, talked with Quigley in Pittsburgh, the latter told him, "I got the travelers' checks at my house, they were delivered to me the day before we left for Pittsburgh."

On April 19, 1938, Van Bever received a telephone call from Parker at the Hartman Drug Store in the Medinah Club. Parker said, "Meet me at the La Salle-Wacker Garage right away." Van Bever said, "Frank, what time have you got on your watch?" Parker said, "It is 10:20." Van Bever said, "I'll be there within fifteen minutes." Van Bever then called Keyes of the American Express Company on the telephone and proceeded toward the garage with a man named Long, connected with the Burns Agency. Long remained outside. When Van Bever entered the garage Parker was about midway toward the rear thereof. He asked Van Bever if he had the money and Van Bever said that he had $150. Van Bever asked Parker if he had the "paper" and the latter said, "Yes, here is the paper." Parker handed Van Bever a package wrapped in brown paper with a string

around it, which was about four or five inches in length and a couple of inches wide. Van Bever looked inside the package and found some counterfeit travelers' checks. He asked Parker how many there were and Parker told him $1,050 worth. Van Bever asked what the extra $50 was for and Parker said, "That's for you." Van Bever handed Parker $150 in cash, which Mr. Walsh of the American Express Company had given him, and started to leave. Parker called him back and handed him another package telling him that he wanted him to hold this package until Parker should call for it. Parker and Van Bever left the garage. When Van Bever got up on La Salle street he saw Keyes there. Van Bever took a taxicab and went to the office of the American Express Company. Mr. White, the general manager of the Express Company, Mr. Walsh, the financial manager, Mr. Troyana, Mr. Eldridge and Mr. Keyes, special agents, were there, and Van Bever handed both parcels to Mr. Keyes. The package Parker had given Van Bever to keep for him contained counterfeit checks, all of the denomination of $20.

Harold Keyes testified that he received a telephone call from Van Bever at about 10:35 on the morning of Tuesday, April 19, 1938; that he immediately left his office, intercepted Van Bever at Wacker drive, walked with him for about a block and then followed Van Bever to the La Salle-Wacker Garage; that when he got to the garage he saw Parker and heard a girl inside of the garage calling Parker's name; that he then went back across the street and waited until he saw Parker leave the garage and walk south on La Salle street; that he then returned to the office of the American Express Company, where Van Bever handed him two packages; that one of these packages contained one hundred fifty-three $20 counterfeit checks and the other contained five $100 counterfeit checks and eleven $50 counterfeit checks; and that Mr. Walsh and Mr.

Eldridge of the American Express Company took down the numbers of the checks.

Joseph T. Walsh testified that on the morning of April 19, 1938, Van Bever came into the office of the American Express Company with two packages wrapped in brown paper, one secured with a piece of twine and the other secured with a piece of gummed tape; that the first package was immediately opened and it contained eleven $50 counterfeit American Express Company travelers' checks and five $100 American Express travelers' checks; and that he made a list of the numbers of these checks. Walsh testified further that he also made a list of the one hundred fifty-three $20 counterfeit checks contained in the other package; and that the package containing the one hundred fifty-three $20 counterfeits was rewrapped and returned to Van Bever and the other package containing $1,050 in counterfeit checks was retained by him. Both of the foregoing lists were received in evidence.

Charles J. White, the general manager of the American Express Company, testified that he was in the office of the company on the morning of April 19, 1938, when Van Bever came in with two packages containing counterfeit travelers' checks; that both packages were wrapped in brown paper; that the small one contained five $100 counterfeit checks and eleven $50 counterfeit checks; that the other package contained one hundred fifty-three counterfeit $20 travelers' checks; that lists were made of the serial numbers of the checks in both packages; that one package was retained by the American Express Company; and that the other package containing one hundred fifty-three $20 counterfeit checks, was returned to Van Bever.

Charles C. Troyana's testimony was to substantially the same effect in this regard as that of White, Walsh and Keyes.

Later in the day on April 19, 1938, when they were in Parker's office at 30 North La Salle street, Parker

asked Van Bever what he had done with the other package of checks and Van Bever told him that he had left it at the Medinah Club. Parker told Van Bever to get the package because he needed two or three of the checks as there was a man coming in for some. Van Bever then left Parker's office and met Keyes down on La Salle street. Van Bever and Keyes went to the top floor of the building at 100 N. La Salle street where Van Bever opened the package and took therefrom three of the counterfeit checks. Van Bever remained on La Salle street a short time before he returned to Parker's office. When Van Bever got off the elevator at 30 N. La Salle street, he saw Parker and Moran in the hallway with a package wrapped in brown paper, which one of them was handing to the other. Keyes testified that when Van Bever left the office of the American Express Company on the morning of April 19, 1938, after bringing the two packages of counterfeit checks there, he followed him to 30 N. La Salle street and remained downstairs; that after twenty minutes or half an hour Van Bever came out of that building and signaled Keyes to follow him to the building at 100 N. La Salle street; and that he and Van Bever went up to the top floor of said building where Van Bever extracted three counterfeit travelers' checks from the package which he had with him.

Still later in the afternoon of April 19, 1938, Van Bever was again in Parker's office at 30 N. La Salle street. At that time there was a typewritten letter on Parker's desk and after telling Van Bever to add something in writing at the bottom thereof, Parker said, ''Well, tell him he can get this paper in 20's and 50's and 100's at 20 per cent.'' After Van Bever had written a memorandum below the letter he asked Parker what name to use in signing same and Parker said it was all right to use any name. Van Bever said, ''Will J. R. Harrison do?'' Parker told him that that was fine and to use an address in care of Johnny

Ahern's saloon. Then Parker asked Van Bever for one of the $20 checks. After signing the name "Frank" to the typewritten portion of the letter Parker placed the counterfeit traveler's check with the letter in an envelope and put two 3c stamps on the envelope and wrote "Air Mail" thereon. Parker was about to leave the office to drop the letter in the chute when Van Bever said "Frank, you let me mail that, you're busy." Parker gave the letter to Van Bever to mail and he took it to Keyes, the American Express Company agent, who had it photostated.

Keyes testified that about 6 p. m. on April 19, 1938, Van Bever came to the office of the American Express Company and handed him a letter addressed to Mack Carlin, 1640 Ocean avenue, Brooklyn, New York; that Parker's address, 1618 Jonquil terrace had been on the upper left hand corner of the envelope, but that it had been "erased pretty well"; that he sent the envelope and its contents to be photostated; and that when the envelope and its contents were returned, he sealed the original envelope after replacing the letter and counterfeit check therein and mailed it. Photostatic copies of the envelope, letter and counterfeit check were received in evidence. The typewritten letter just referred to reads as follows:

"Dear Mack:

"Not having heard from you for quite some time thought I would drop a line to say hello. How are things in the big city? A friend of mine has something that I think you might be interested in, so I am having him write you relative to same. If interested kindly give him an air mail special at once so that he will not make other arrangements in New York. He is a very reliable person. Kindly tell John Popkin that I received the statement or engineer's report that he mailed me.

"With best personal regards,
"Sincerely yours,
Frank."

Just below the typewritten letter appeared the following in handwriting:

"Enclosed please find sample. They come in 20-50-100 20 per cent. Let me know how many you can handle and in what denomination,

"Yours truly,
J. E. Harrison,
c-o Johnny Ahern,
176 N. La Salle Street."

Parker admitted that he dictated the typewritten portion of the foregoing letter and stated that Mack Carlin, to whom the letter was addressed, was an old friend of his, but that he knew nothing about the handwritten portion of the letter. He stated that the typewritten portion of the letter referred to air conditioning machinery.

On the evening of April 20, 1938, Parker took Van Bever to his apartment for dinner, where he met Mr. and Mrs. George Moran. They were introduced to Van Bever by Parker as Mr. and Mrs. Hanley. After dinner Moran said he had a "meet" at the Belmont Hotel at 9 o'clock. Parker then drove Van Bever down to Clark and Division streets, where the latter alighted from the car. Van Bever notified three Burns detectives of the meeting at the Belmont Hotel about which Moran had spoken.

Harold C. Keyes testified that he went to the Belmont Hotel a little after 9 p. m. on April 20, 1938, and saw Moran leaning through the doorway of a black sedan talking to somebody; that he entered the hotel and saw Parker walking around the lobby with his hat off; and that later he saw Parker, Moran and another man enter an automobile.

On the night of April 20, 1938, Driscoll, Sexton and Quigley bought tickets at the Union Station and boarded a train for Pittsburgh at 11:15 p. m. Keyes went to the Union Station in response to a telephone call that he had received from one of his operatives and saw Driscoll, Sexton and Quigley purchase the

railroad tickets and board the train. Troyana, another agent for the American Express Company, missed the Pittsburgh train but he took an airplane and arrived in Pittsburgh sometime before Driscoll, Sexton and Quigley did. Before leaving for Pittsburgh on April 20, Keller [Driscoll] and Sexton passed two $50 counterfeit checks in Chicago, one at the Stetson Shoe shop on South Dearborn street and the other at Carson, Pirie, Scott & Company. These checks were received in evidence.

As soon as Troyana reached Pittsburgh he got in touch with the police there and with their assistance kept Keller, Sexton and Quigley under surveillance. They had cashed one $100 counterfeit check and were arrested while in the act of passing another $100 counterfeit check. When they were arrested they had in their possession counterfeit checks in the face amount of $21,050.

Late in the afternoon of April 21, 1938, Van Bever received a telephone call from Parker, who told him that there had been a "snatch" in Pittsburgh and asked Van Bever what he knew about it. Van Bever told him that he did not know anything about it and Parker then told Van Bever to meet him at Ray's Chop House on Illinois street in twenty minutes and bring with him the package of checks which Parker had left in his care. Van Bever met Parker at the appointed time and place and turned over to him the package containing the $20 counterfeit travelers' checks which Parker had theretofore given him, and Parker said, "I have just talked to George, some son-of-a-bitch is going to get killed, there are too many people in this deal, what do you know about it?" Van Bever replied that he did not know anything about it. Parker then said, "What are you so nervous about? Quigley is O. K. Quigley is a stand-up-guy; nothing to worry about." Parker and Van Bever then drove south on the under-pass below Michigan avenue and Parker

said, "I think Ross is the son-of-a-bitch that tipped this off, and if he did he is going to get killed." Van Bever said, 'Well Frank, before you hurt anybody, I would be sure that you got the right man." They went into the Lower Deck Tavern on the lower level of Michigan avenue and Parker went to the telephone booth in the rear. When he returned he said he had just talked to George and George was on his way to the tavern. They had several drinks, during which time Parker made several trips to the telephone booth and Van Bever saw him go into the lavatory once or twice. Later that evening Parker telephoned Van Bever and asked him to find out from his friend at the detective bureau how many of the counterfeit checks Keller, Sexton and Quigley had when they were arrested in Pittsburgh. He also asked him to come down and meet George but Van Bever told Parker that he was tired and was going to bed. That same evening Parker was arrested at 7:30 p. m. in Miss Springer's office at 30 N. La Salle street. Moran was also arrested that evening at 11 p. m. at his apartment, 240 E. Delaware place.

On April 23, 1938, Van Bever with Charles J. White and Harold C. Keyes of the American Express Company and Detective Paradowski, went to the Lower Deck Tavern on the lower level of North Michigan avenue. Van Bever went inside while the others remained outside in the automobile. While he was in the tavern he made a search of the lavatory and found in a hole in the wall under the drain pipe from the lavatory, in the space back of the plaster board, a roll of counterfeit travelers' checks with a rubber band around it. He took it out exactly as he had found it and handed it to Keyes.

Keyes testified that he went with the aforementioned persons to the Lower Deck Tavern; that Van Bever entered same alone; that when Van Bever returned to the automobile from the tavern he gave him a roll of

$20 counterfeit checks, which he had found in the men's toilet room. The testimony of Charles J. White in this regard was substantially to the same effect.

On April 24, 1938, after Parker had been released on bond, he telephoned Van Bever and asked him to meet him at Ray's Chop House on Illinois street. Parker drove up in a Ford car, picked up Van Bever and they drove south under Michigan avenue to the Lower Deck Tavern. While they were in the tavern Parker said to Van Bever, "You are a lucky son-of-a-bitch, we have looked into it and it does not look like you are the tip-off man at all."

On the early afternoon of April 26, 1938, Parker went to Van Bever's office in room 316, 520 N. Michigan avenue, Parker having made this appointment by telephone. When Van Bever entered the office Parker was already there and asked, "Is there anything new?" Van Bever said, "No there is not anything new." Parker said, "Well, stick around a little bit, George is on his way down." In a little while Moran entered the office and said "hello." Moran then said, "You haven't anything to worry about, they have not anything on us." Parker then said, "I think I will go to Pittsburgh." Moran said, "Don't go," or "I don't think I would go," or something to that effect.

On April 28, 1938, Moran telephoned Hanson and asked him to go to Jake's book. When Hanson got there Moran said that he supposed Hanson had read the papers. Hanson said that he had read them and that he supposed that they were all "washed up." Moran then said, "No, we will take care of you, but you better destroy some of those copies you have up there." He told Hanson to hide the plates so nobody could get hold of them. Hanson agreed to do so. About the middle of August Carl Silver called Hanson and asked him for the plates from which he had made the checks. Hanson told him that he had already melted

them. Silver asked him if he had any of the metal left and Hanson said that he had the melted zinc. Silver then told him to take it down in front of 727 S. Dearborn street and give it to Moran. Hanson went to the place designated with the can of metal and handed it to Moran, who was in the car with several other men, and Moran handed him $2.

When Sexton and Keller were brought to trial in Pittsburgh they each entered a plea of guilty and were sentenced there. Both Sexton and Keller testified upon the trial of this case that Van Bever had given them the counterfeit checks, telling them that they were genuine American Express Company travelers' checks, which he had purchased at a discount at a bankruptcy sale, and that he did not want to dispose of them in his own name, but that he would give Sexton, Keller and Quigley a commission if they would sell them for him; and that Van Bever also told them that he desired their assistance in order to avoid any civil action that might be brought against him. They testified further that Sexton assumed the name of Sloan, Keller assumed the name of Driscoll and Quigley assumed the name of Carpenter at the suggestion of Van Bever.

Moran in his testimony denied that he had any part in the conspiracy. Parker testified in effect that he was a substantial business man; that he owned gold mines in Colorado and two Chicago breweries and denied that he had any part in the conspiracy. A certified transcript of the record of conviction in the criminal court of Cook county of George Moran in 1917 of the crime of robbery and a certified transcript of the record of conviction in the criminal court of Cook county of Frank J. Parker in 1914 of the crime of burglary were received in evidence.

Defendants' contentions as stated in their brief are as follows:

"It is respectfully contended that the verdict rests entirely upon the uncorroborated testimony of accomplices.

"Before the trial in the case at bar, while Sexton, Keller and Quigley were serving jail sentences in the East, the state brought Parker, Moran and Hicketts to trial before Judge Fardy in the criminal court of Cook county. On the same evidence produced here a jury found Parker, Moran and Hicketts not guilty. An offer to prove said fact in support of a claim of former jeopardy on behalf of these defendants was denied by the trial court.

"It is also contended that the court erred in other rulings concerning the evidence and in the giving and refusing of instructions.

"Further that the acquittal of Sexton and Keller as principals precludes the guilt of Parker and Moran as accessories. Also we present a federal question, claiming that due process of law was not afforded the defendants as guaranteed by the 14th Amendment to the Constitution of the United States."

The evidence shows conclusively that the defendants Parker and Moran entered into a conspiracy with others to forge and counterfeit checks purporting to have been issued by the American Express Company and to publish and pass said forged and counterfeit checks with intent to defraud such persons as could be induced to accept them and pay the conspirators money or property therefor. There is an abundance of evidence in the record to show beyond any reasonable doubt that Parker and Moran were prime movers in the conspiracy.

There is no merit in defendants' contention that their conviction resulted entirely from the uncorroborated testimony of accomplices. It clearly appears from the evidence that Van Bever never entered into the conspiracy and that he therefore never became an accomplice. According to Van Bever shortly after

Parker broached the counterfeit scheme to him, he notified his friend Paradowski, the police officer, who in turn related the facts to the officials of the American Express Company. That company employed Van Bever as an investigator to keep in touch with the situation and follow it through and to keep the representatives of the Express Company informed as to the results of his investigation as it progressed. He followed the instructions and directions given him and kept the representatives of the American Express Company fully advised of his activities at all times so that Harold C. Keyes and other Express Company agents, as well as the Burns operatives could observe his contacts with those engaged in the conspiracy. Neither knowledge nor concealment of knowledge that a crime is being or is about to be committed can constitute one an accomplice, and the generally accepted test as to whether a witness is an accomplice is whether he himself could have been indicted for the offense, either as principal or as accessory. (*People v. Hrdlicka*, 344 Ill. 211.) Van Bever's entire career, including all the circumstances bearing upon his association with some of the defendants, including Parker and Moran, was placed before the jury and the question of his credibility was purely for the jury. His testimony was corroborated in many material and essential respects by that of Harry C. Eldridge, Harold C. Keyes, Charles C. Troyana, Joseph T. Walsh and Charles J. White, highly reputable officials and representatives of the American Express Company, as well as by numerous documentary exhibits in evidence.

It is true that the witnesses, Hanson, Bruno and Ahrens were accomplices and the rule is that the testimony of an accomplice is competent evidence and may be sufficient to sustain a conviction, although uncorroborated, if it is of such a character as to prove guilt beyond a reasonable doubt, but is always subject to grave suspicion and should be acted upon with great

caution. There was some corroboration of Hanson's testimony and we think that his testimony, as well as that of Bruno and Ahrens was of such a nature that the jurors were fully warranted in believing same. Their evidence establishes beyond a reasonable doubt the actual counterfeiting phase of the conspiracy.

Defendants complain that the testimony of the witness Van Bever was incompetent and prejudicial in the following instances: (1) "Frank Parker said to me, well, I knew Ollie for a number of years before he went to the penitentiary in Stateville. I said I knew Ollie when he used to run around with — Mr. Stewart: Now, your Honor, we move to strike that, not material, what he knew about Ollie Berg. Ollie Berg is not figuring in this case. The Court: Well, I don't see how it is material. Mr. Wright: It is not as to Ollie Berg, except it is a conversation that shows the development of their acquaintanceship. Mr. Stewart: I object and move to strike it out, your Honor. The Court: Strike it out." (2) "Q. Tell the Court and jury what was said and done there at that time? A. Frank Parker said to me, 'There is a deal on some paper. It is going to be a lot of money made. I had a deal a year or two ago,—'' Mr. Stewart: I move to strike that out, that reference to any deal two or three years ago. That could not be material here. The Court: Strike it out." (3) "Parker then came back to the table or the booth. Speedy said, 'I wonder where I could get hold of a good printer? I was with the Yellow Kid Weil today. I got to get a printer.' That is about all of that transaction. Mr. Stewart: Your Honor, may we have that stricken about being with Yellow Kid Weil. The Court: Strike it out."

It will be noted that in each instance the foregoing testimony was immediately stricken upon the objection and motion of defendants' counsel. In the last two instances quoted the answers of the witness were not made in response to direct questions asked for the

purpose of eliciting the statements made by Van Bever and it cannot be said that any of the foregoing answers made by him were of such a prejudicial nature as to warrant reversal in view of the overwhelming evidence of the guilt of plaintiffs in error.

There is no merit to the contention of plaintiffs in error that their counsel were unduly limited in their cross-examination of Van Bever, Hanson, Bruno and Ahrens. Numerous instances are pointed out as to which it is claimed that the trial court improperly sustained objections to questions asked the aforesaid witnesses on cross-examination. We have carefully examined all the instances of undue limitation of cross examination complained of and find that the questions asked were either argumentative or otherwise improper or concerned matters which were immaterial or had already been covered. Defendants' counsel were not only not unduly limited in their cross-examination but the record discloses that they were allowed the widest latitude consistent with the rules governing proper cross-examination We find no basis in the record for the suggestion of counsel for plaintiffs in error that the jury might well have received the impression from the conduct and rulings of the trial judge that he was "on the side of the State."

Plaintiffs in error contend that nine of the fifteen instructions proferred by the State were erroneously given to the jury by the trial court and that the trial court also erred in refusing to give to the jury five instructions proffered by the defendants. We have carefully examined all the instructions given by the court and are satisfied that the jury was fully and fairly instructed as to the law applicable to every phase of this case, both from the standpoint of the prosecution and the defense. To analyze and discuss each of the "given" instructions objected to would serve no useful purpose and would only further lengthen this already long opinion. Defendants' re-

fused instruction No. 42 is as follows: "A person cannot be put into a crime by the acts and conduct of other persons alone." The court did not err in refusing to give this instruction since it merely stated an abstract principle of law and in any event it was covered by other instructions given to the jury. As to the other four instructions which the court refused to give, it is sufficient to state that they did not apply to any theory of defense of Parker or Moran. They dealt solely with the defense of entrapment advanced by defendants Sexton and Keller. These instructions could not have pertained to Parker and Moran since both of them denied that they knew anything about the counterfeit checks, that they had any knowledge of the conspiracy or that they participated in it.

It is also contended that the trial court erred in refusing to permit plaintiffs in error to offer proof of former jeopardy. Sometime prior to the trial of the case at bar, while Sexton, Keller and Quigley were serving sentences in Pennyslvania imposed upon them for passing the American Express Company checks in Pittsburgh, Parker, Moran and Hicketts were indicted in the criminal court of Cook county on a charge of forging and uttering the check which was cashed at the Stetson shop in Chicago on April 20, 1938. They were brought to trial in the criminal court before the same trial judge who tried this case and acquitted. In our opinion there was no former jeopardy and neither was there any proper offer of proof of former jeopardy.

It is idle to urge that the acquittal of Sexton and Keller precluded the guilt of Parker and Moran as accessories. Parker and Moran were indicted, tried and convicted as principals and the evidence clearly shows their guilt as such.

Convinced as we are that plaintiffs in error received a fair trial and that the record discloses that no reversible error was committed upon the trial, the judg-

ment and sentence of the criminal court of Cook county as to defendants Frank Parker and George Moran are affirmed.

*Affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.